## Case No. 3,079.

### In re COMSTOCK et al.

[3 Sawy. 320;[1] 12 N. B. R. 110.]

District Court, D. Oregon. April 6, 1875.

PURCHASE AND SALE OF WHEAT — SETTLEMENT BETWEEN DEBTOR AND CREDITOR—PREFERENCE.

1. Where L. & G., of Portland, Oregon, sold wheat to M. & H., of San Francisco, to be delivered on shipboard, at Portland, at $1.85 per cental, and then made a contract with C. & Co., wheat buyers, to purchase said wheat on joint account, each party to furnish one-half of the money necessary to make the purchase, and to receive one-half of the profits, if any: Held, that the joint venture and the interest of C. & Co. in the wheat ended with the delivery of the same on shipboard, and that thereafter the wheat belonged to M. & H., subject to the power of L. & G. as sellers of the same, to exercise the right of stoppage in transitu, and that when, upon the failure of M. & H., said L. & G. exercised said right and took said wheat into their own possession, it was for their own benefit as sellers of the same, and not that of C. & Co., who were not the sellers of the wheat

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

to M. & H., and had no power over it or interest in it.

2. A mere accounting or settlement between an insolvent debtor and creditor, not followed by any actual change or transfer of property, rights or credits, to the prejudice of other creditors, is not contrary to the bankrupt act [of 1867 (14 Stat. 517)], but the assignee of such debtor is not bound by such settlement, but may show that it is erroneous or fraudulent.

3. A preference will not bar the proof of a debt, unless it was given and received by the parties to such debt, and therefore where a creditor received a preference from the firm of A., B. & C., he is not barred from proving another debt against the firm of B. & C.

In bankruptcy. Objections to proof of debt.

William Strong, for assignee.

John W. Whalley and M. W. Fechheimer, for creditor.

DEADY, District Judge. On December 16, 1873, a petition in bankruptcy was filed in this court against C. B. Comstock & Co., on which they were adjudged bankrupts on January 23, 1874. Laidlaw & Gate proved a debt against the bankrupts of $24,406.30, gold coin, with interest from November 25, 1873, for money paid said Comstock & Co., on a contract to deliver said Laidlaw & Gate 10,000 quarters of wheat. Prior to June 10, 1874, a dividend of forty-three per cent. was declared but not paid upon this claim, because on that day the assignee of the estate filed objections thereto, to the effect that on December 2, 1873, Comstock & Co. being insolvent and indebted to Laidlaw & Gate in the sum of $43,809.66, with interest, to give them a preference, and in fraud of the act, delivered to said Laidlaw & Gate, in part payment of said indebtedness, 9,268.96 centals of wheat, worth about $19,403.36; and that said Laidlaw & Gate, at the time of said delivery, had reasonable cause to believe that Comstock & Co. were insolvent. The answer of Laidlaw & Gate denies the allegations of the objections, and avers that these 9,286.96 centals of wheat were delivered to Laidlaw & Gate by Comstock & Co. between November 1 and 13, 1873, upon a contract made on August 29, 1873; and that between November 6 and 10, 1873, Laidlaw & Gate advanced Comstock & Co. $31,000, upon a contract to purchase and deliver 10,000 quarters of wheat, which Comstock & Co. wholly failed to perform.

After hearing the evidence and arguments of the parties, the register, Mr. H. H. Northup, on March 6, 1875, found the facts as follows: "On the twenty-ninth day of August, 1873, Laidlaw & Gate entered into a contract in writing with C. B. Comstock and Co. to purchase on joint account a cargo of from 4,000 to 5,000 quarters of wheat, the same being already sold by Laidlaw & Gate at $1.85 per cental, to whom the wheat purchased by Comstock & Co. was to be delivered, the net profit to be equally divided." About the twelfth of September, 1873, a verbal contract was entered into between Laidlaw & Gate and Comstock & Co., or "rather an arrangement," by which Laidlaw & Gate sold to the firm of Makin & Hubbak 10,000 quarters of wheat at $2.15 per cental. On this contract no money was paid. On the thirtieth of October, 1873, Laidlaw & Gate requested and authorized in writing Comstock & Co. to purchase on their account 50,000 bushels of wheat at $1.80 per cental. The price was afterwards advanced to $1.90 per cental, Comstock reporting that he could not purchase at $1.80.

On this contract of October 30, 1873, there was advanced by Laidlaw & Gate to Comstock & Co., on the sixth of November, 1873, $6,000, and on the tenth of November, 1873, $25,000, Comstock reporting that he had purchased, and held in warehouse ready for delivery, wheat to the amount of over that sum in value. Between the third and twelfth of November, 1873, Comstock & Co. delivered on board the Fifeshire and Santa Rosa, two vessels then lying in the Wallamet at Portland, 9,268.96 centals of wheat, the delivery being noted in a book kept by Laidlaw & Gate, called "Cargo Book," and credit for so much wheat delivered, given to Comstock & Co., although no price was carried out. The agent to receive this wheat on board these vessels was one P. Cherry, who kept the book above named, an employee of Laidlaw & Gate, although his salary was charged to the "joint adventure," and thus one-half of it was paid by Comstock & Co.

On November 7, 1873, Laidlaw & Gate drew on Makin & Hubbak, the San Francisco firm to which the wheat was to be shipped, for $16,132.74, the value of 8,631.98 centals of wheat at $1.85 per cental and $42.59 interest. This draft was dishonored and protested at San Francisco, on the thirteenth of November, 1873, and Laidlaw & Gate immediately advised thereof. At this time Comstock & Co. held a large quantity of wheat, "for," Comstock says, "the failure of Makin & Hubbak left me with a large amount of wheat on hand." Immediately on receipt of intelligence of the failure of Makin & Hubbak, Laidlaw & Gate exercised the right of stoppage in transitu over the 9,268.96 centals of wheat loaded on the Fifeshire and Santa Rosa, and, under instructions, handed over the charter parties of these vessels to Henry Hewett & Co., of Portland, agreeing with said Hewett & Co. to take an equal quantity of wheat in warehouse for that placed on board those vessels; which agreement was consummated.

Some time after the thirteenth of November, 1873, or perhaps on that very day, a controversy arose between Laidlaw & Gate and Comstock & Co. about this 9,268.96 centals of wheat; not in regard to its delivery nor respecting the title (for both parties seem to have treated the delivery to Laidlaw & Gate as binding on Comstock & Co., and vesting the title in Laidlaw & Gate), but as to the contract or contracts on which this wheat

was delivered. Laidlaw & Gate claimed that it was all on the contract of August 29, 1873, at $1.85 per cental. Comstock admitted that about three-fourths of it was delivered on the contract of August 29, 1873, which filled and completed that contract, but claimed that the remaining one-fourth was on the verbal contract of September 12, at $2.15 per cental. This was denied by Laidlaw & Gate, who insisted that the verbal contract of September 13 was void, no money ever having been paid on it, and that if any wheat was delivered after filling the contract of August 29, 1873, it was delivered on the contract or request of October 30, 1873, at $1.90 per cental.

This controversy continued until November 25, 1873, Comstock & Co. refusing to deliver any more wheat until the matter was settled and claiming damages by reason of large lots of wheat purchased for the verbal contract of September 12, for which he had paid more than $1.90 per cental. On November 25, 1873, a settlement was made and all prior contracts merged in the contract of that date. On the second of December, 1873, a credit appears on the books of Laidlaw & Gate to Comstock & Co., for the 9,268.96 centals of wheat.

The real point to be decided, in my judgment, is, when did the title to the wheat in question vest in Laidlaw & Gate. From the evidence I find that on the second of December, 1873, and for some days prior thereto, Laidlaw & Gate had reasonable cause to believe that Comstock & Co. were insolvent, and if the title remained in Comstock & Co. until the entry on Laidlaw & Gate's ledger, a preference was taken under the bankrupt act. I further find that on the twelfth day of November, 1873, the last day on which wheat was delivered, Laidlaw & Gate did not have reasonable cause to believe that Comstock & Co. were insolvent, and that if the title then passed to Laidlaw & Gate, no preference was taken under the bankrupt act. Laidlaw testifies that after the wheat was delivered on shipboard, Comstock & Co. had no further control over it. This is not controverted or denied, although Comstock was put on the stand. Laidlaw & Gate also on the thirteenth of November, 1873, exercised the right of stoppage in transitu over this wheat without any question by Comstock & Co., and more than that, disposed of it without any objection.

The controversy seems to have been as to which contract the wheat was delivered under, and further than that as to the amount of damages that Laidlaw & Gate should allow Comstock for other wheat that he then held. It is a recognized principle that the sale is not complete while anything remains to be done to determine its quantity if the price depends on this, unless this is to be done by the buyer. I think the wheat delivered was treated by both parties as belonging to Laidlaw & Gate, and the fact that credit was not entered in the books of Laid-

law & Gate until December 2, 1873, is not material. Credit for so much wheat was given in the "Cargo Book" at the time of delivery, and the amount of credit, it seems to me, is not material, particularly as neither party then knew the amount of credit to be given, and by the course of business this could not be determined until sometime after. The register ruled that the proof of debt should stand as made, and the question was certified here for decision.

In the course of the inquiry before the register, all the dealings between Laidlaw & Gate and Comstock & Co., prior to August 29, 1873, consisting of contracts to purchase and deliver wheat to load particular vessels, were examined, and a great mass of testimony introduced which has no special bearing on the controversy. It being shown by the evidence, and practically admitted, that up to the delivery of this 9,268.96 centals of wheat on the Fifeshire and Santa Rosa, to wit: November 12, 1873, Laidlaw & Gate had not reasonable or any cause to believe that Comstock & Co. were insolvent, it follows that if the property in the wheat vested in them at the time of such delivery, no preference was thereby given or received.

Comstock & Co. were engaged in purchasing wheat throughout the country for delivery to third persons for shipment abroad. Laidlaw & Gate having this contract with Makin & Hubbak, of San Francisco, to deliver them 4,000 or 5,000 quarters of wheat in September and October, employed Comstock & Co., as they had done in other like instances, to purchase the wheat and deliver it on shipboard for them. Instead of agreeing to pay them a certain commission for their services, it was arranged that Comstock & Co. should have a share of the profits, if any, made by Laidlaw & Gate on the venture, and that they should also advance one-half of the money necessary to fulfill the contract. This being so, the transaction was a joint venture, commencing with the purchase of the wheat and ending with the delivery of it on the vessels at Portland. After the delivery on board, Comstock & Co. had no interest in the property, and so they seem to have understood the matter.

By the contract of August 29, Comstock & Co. did not become parties to the prior contract between Laidlaw & Gate and Makin & Hubbak, by which the former sold and were to deliver to the latter 4,000 to 5,000 quarters of wheat as above stated, at $1.85 per cental. Between Comstock & Co. and Makin & Hubbak, there was no privity or relation. If Laidlaw & Gate made a profit on the transaction with Makin & Hubbak, Comstock & Co. were entitled to half of it and Laidlaw & Gate were liable to them for such share of the profits irrespective of the failure of Makin & Hubbak to meet their engagements with Laidlaw & Gate. As the owners of the property, Laidlaw & Gate exercised the right of stoppage in transitu up-

on the failure of Makin & Hubbak, and disposed of the wheat to Hewett & Co., as they had a right to. But for this the property would have long since figured in the assets of Makin & Hubbak.

The facts being found as stated, the failure to enter the value of the wheat in the ledger of Laidlaw & Gate at the time of delivery is immaterial. An entry in the books of a party, or the absence of it, may be evidence against him of more or less weight, owing to the circumstances, but is not conclusive. In this case the receipt of the wheat by Laidlaw & Gate from Comstock & Co. appears to have been regularly and duly entered in the cargo book of Laidlaw & Gate by their agent and employee, P. Cherry. Comstock & Co. were duly credited in the ledger with the amount of the wheat, but the value of it could not be entered until the cost on board was ascertained or agreed upon. By the terms of the agreement between Laidlaw & Gate and Comstock & Co., the latter were to be credited with the wheat at the cost and charges on board, not exceeding the price at which it was sold to Makin & Hubbak. Owing to the disagreement between Laidlaw & Gate and Comstock & Co. as to what contract 636.98 centals of the wheat delivered on the Fifeshire and Santa Rosa was to be accounted for—whether that of August 29, at $1.85 per cental, or that of September 12, at $2.15 per cental, or the order of October 30, at $1.90 per cental—and the claim by Comstock & Co. for damages on account of wheat purchased at a high figure on a falling market under the contract of September 12 and not received by Laidlaw & Gate, there was a delay in ascertaining the value of this wheat and the amount with which Comstock & Co. were to be credited on account of it. Finally, on November 25, the parties had an accounting and settlement, Comstock & Co. having the advantage of being Laidlaw & Gate's debtors for $31,000 advanced to them, seem to have dictated the terms of the settlement, by which they were allowed the full price they had paid for all wheat delivered up to that time. The sum due upon the wheat to Comstock & Co. was deducted from the $31,000, and for the balance Laidlaw & Gate prove their claim. This accounts satisfactorily for the delay in making the final entry in the ledger of Laidlaw & Gate.

It is also quite possible that this settlement may have been acquiesced in by Laidlaw & Co. upon the impression that Comstock & Co. were in a doubtful condition financially, and that it was better to close with them upon their own terms before they failed. Upon its face the writing wears the look of a device intended to reach backward and give a new color to past transactions with a view of protecting them from some new and impending danger. Its language is probably the result of carelessness or ignorance, or an attempt to cover more ground than was necessary or the facts authorized. While there is no reason to doubt but that it states the result of the settlement truly, to wit, that Comstock & Co. should be allowed full cost for all the wheat delivered to Laidlaw & Gate without reference to the limitation of $1.85, $2.15, or $1.90 per cental under which it was purchased, yet it does not represent the transaction according to the facts proven by the evidence.

Here is a copy of the agreement, which appears to be in the handwriting of Comstock: "Portland, Oregon, 25 November, 1873. Messrs. Laidlaw & Gate, Portland—Gentlemen: We have this day sold you, and we confirm the sale by this letter, ten thousand quarters of good merchantable Oregon wheat, to be delivered in Portland warehouses. The price you are to pay us for it is to be the price we actually have paid, with any charges that may be incurred up to the time of delivery. Cash to be paid against warehouse receipts. We acknowledge to have received on account of this sale the sum of thirty-one thousand dollars, less the amount of your present debt to us, which is estimated at about six thousand dollars. We are, yours truly, (Signed) C. B. Comstock & Co."

No wheat was in fact sold to Laidlaw & Gate by that agreement or on that date, as therein assumed and represented. The contract of September 12, if valid and binding, was the latest one between the parties for the delivery of wheat, and the last wheat delivered by Comstock & Co. under any contract or order was delivered on November 12, 1873.

It is not necessary to the decision of the question arising upon the objections to find whether Laidlaw & Gate had reasonable cause to believe that Comstock & Co. were insolvent at the date of this settlement. But assuming that they had such cause so to believe, the rights of the general creditor, as represented by the assignee, would not be impaired by such settlement. A creditor and debtor have a right to state an account and strike a balance, although the former may know that the latter is then insolvent. A mere accounting between parties does not prefer the creditor or diminish the assets of the debtor. But if the debtor is adjudged a bankrupt, the assignee, representing the general body of creditors, is not bound by such settlement, and if found incorrect or fraudulent it will be disregarded. A settlement or accounting with an insolvent debtor, particularly where the parties, as in this case, use language calculated to make an erroneous impression as to the facts of the transaction, will naturally, if favorable to such creditor, excite the suspicions of the other creditors, and should be closely scrutinized; but in itself, if honestly and fairly conducted, there is nothing illegal or contrary to the bankrupt act. In this case the result of the settlement, however the language in which it is stated may be open to

criticism, appears to have been as favorable to Comstock & Co. as it should, and therefore the other creditors were not prejudiced by it. If, however, the assignee has reason to think otherwise, he is at liberty to raise the question whether the sum claimed —$24,406.30—was really due Laidlaw & Gate from Comstock & Co. on November 25, 1873.

Upon the hearing before the court, it was argued by counsel for the assignee that the contracts between Laidlaw & Gate and Comstock & Co., of August 29 and September 12, made them partners inter se in the purchase and delivery of wheat to Makin & Hubbak, and that therefore the property in this wheat never vested in Laidlaw & Gate, but remained the property of this special partnership, composed of Laidlaw & Gate and Comstock & Co. It is not found by the register whether this was a partnership transaction or not, and it is immaterial to the decision of the question before the court how the fact is. It is not probable, upon this evidence, that the parties intended to constitute a partnership, even between themselves, and unless they did so, none would result. In re Francis [Case No. 5,031]. But admitting they were partners, and that this fact in some way, which is not apparent, prevented a delivery of the wheat from being made to Laidlaw & Gate, and from them to Makin & Hubbak, as is claimed by the creditor, and that the wheat, therefore, remained the property of this special partnership until it was delivered to Makin & Hubbak on shipboard, and that the stoppage in transitu by Laidlaw & Gate, members of this partnership, upon the failure of Makin & Hubbak, restored the wheat to such partnership, what follows? In that case the wheat was never the property of Comstock & Co., and would not be an asset of their estate in bankruptcy; nor would their creditors be entitled to the benefit of it. On the contrary, it belonged to this special partnership of Laidlaw, Gate and Comstock & Co., whoever the Co. might be, and was an asset of such firm. The supposed firm of Laidlaw, Gate and Comstock & Co., made no profits but a loss. On November 1, Comstock & Co. owed this firm or Laidlaw & Gate, as the case may be, $12,646.66. The 9,268.96 centals of wheat placed on the Fifeshire and Santa Rosa cost on board $19,403.46, leaving a balance in favor of Comstock & Co. and against Laidlaw, Gate and Comstock & Co. of $3,378.40, that being one-half of the difference between the value of the wheat and the debit to Comstock & Co. In addition to this, Comstock & Co. owed Laidlow & Gate $31,000.

Now, this alleged firm of Laidlaw, Gate and Comstock & Co. did not owe Laidlaw & Gate anything, and therefore could not prefer them. But if there had been a preference given by such firm to Laidlaw & Gate, it could not have the effect to prevent Laidlaw & Gate from proving another debt against a different firm, to wit, that of Comstock & Co. An unlawful preference only bars the proof of a debt between the parties to the preference. The only effect that can be given to this theory of a special partnership in this case is that Laidlaw & Gate, by appropriating the proceeds of the wheat loaded on the Fifeshire and Santa Rosa, obtained the said sum of $3,378.40 of the assets of said partnership more than they were entitled to, and that they are liable to the assignee of Comstock & Co. for the same. In a suit brought to recover the amount, the question would arise whether Laidlaw & Gate could set off a like amount of the $31,000 which Comstock & Co. owed them at the time.

But it is unnecessary to further pursue this inquiry. In any view of the matter, I think Laidlaw & Gate are entitled to prove their debt as claimed by them. I am satisfied upon the evidence that whether the transaction between Laidlaw & Gate and Comstock & Co. be considered a joint venture, or a special partnership, as between themselves, it ended with the delivery of the wheat on shipboard, and that thereafter Comstock & Co. ceased to have any interest in the property, and that the same was the wheat of Makin & Hubbak, sold to them by Laidlaw & Gate, who, in relation to it, had the rights of a seller, including that of stoppage in transitu. It is therefore ordered that the proof of debt by Laidlaw & Gate be allowed to stand, and that they be paid the dividend of forty-three per cent. heretofore declared upon it, with the interest accruing thereon, if any.